**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Marco Yammine, | No. CV-21-00093-PHX-MTL |
| Plaintiff, | **AMENDED ORDER** |
| v. | |
| Toolbox for HR Spolka z Ograniczona Odpowiedzialnoscia Spolka Komandytowa, | |
| Defendant. | |

Before the Court is Plaintiff/Counter-Defendant Marco Yammine's Motion to Dismiss. (Doc. 43.) Yammine argues Counts II, IV, VI, and VII of Defendant/Counterclaimant Toolbox for HR Spółka z Ograniczoną Odpowiedzialnością Spółka Komandytowa's ("TB4HR") First Amended Counterclaim fail for lack of personal jurisdiction. He also argues Counts I, II, IV, VI, and VII fail to state a claim upon which relief can be granted. (*Id.*)

Yammine and TB4HR dispute ownership of the website domain for CV Timeline (the "Domain"). The Domain is registered with GoDaddy, a company located in Arizona. (Doc. 1 at ¶ 7.)  This dispute was originally adjudicated as an administrative proceeding pursuant to the Uniform Domain Name Dispute Resolution Policy ("UDRP") where Yammine was ordered to transfer the Domain to TB4HR. (*Id.* at ¶¶ 5, 26.) In compliance with UDRP, Yammine filed in this jurisdiction to prevent the transfer of the Domain. (*Id.* at ¶¶ 27–28; Doc. 35 at ¶ 56.)  For the following reasons, the Motion is granted in part and denied in part.

## I.      BACKGROUND

TB4HR is a software company based in Warsaw, Poland.  TB4HR's software is designed to help international tech companies recruit technology professionals. (Doc. 35 at ¶¶ 10–11.) Yammine also resides in Poland. (Doc. 43-1 at ¶ 3.) Yammine's relationship with TB4HR began in March 2018. (*Id.* at ¶ 17.)   Though the exact nature of that relationship is disputed, the parties agree Yammine was tasked with developing the precursor to the CV Timeline product. (*Id.*; Doc. 1 at ¶ 8.)

Before 2018, TB4HR "conducted research and development into automating the work of recruiters with enhancements in artificial intelligence." (Doc. 35 at ¶ 15.) This research led TB4HR to believe that "there are patterns that could be followed up on to make enhanced prognostications that accurately identify when a tech professional may be interested in changing their job." (*Id.*) With this research, TB4HR created a new service and product, first naming it "Mageekz" and later renaming it to "CV Timeline". (*Id.* at ¶ 16.)

While developing the product, Yammine and other TB4HR employees had the idea to present resumes on a timeline, which they named "Mageekz for Recruiters." (Doc. 35 at ¶ 21.)  Yammine contends he was the one who came up with this idea, and he and the CEO of TB4HR verbally agreed to develop a product together. (Doc. 1 at ¶ 9.) But TB4HR asserts that Yammine coded Mageekz for Recruiters as part of his job pursuant to a contractor agreement. (Doc. 35 at ¶ 21.) TB4HR began marketing Mageekz for Recruiters in September 2018 through social media. (*Id.*)

Around that time, the parties renamed Mageekz for Recruiters to CV Timeline. (*Id.* at ¶ 22.) TB4HR alleges that it then tasked Yammine with creating a website to market the product. (*Id.* at ¶ 23.)  But Yammine contends TB4HR never showed interest in the new venture, and he took full responsibility getting the project started. (Doc. 1 at ¶ 10.) So, in September 2018, Yammine registered the CVTimeline.com website (the "Domain") with GoDaddy. (*Id.* at ¶ 11; Doc. 35 at ¶ 23.) Yammine maintains that the "Domain Name was registered separate and apart from the Mageekz Project for a venture independent of, and

unrelated to, TB4HR." (Doc. 1 at ¶ 12.) TB4HR states that Yammine began advertising the Domain on LinkedIn on behalf of TB4HR. (Doc. 35 at ¶ 23.) In December 2018, TB4HR fully employed Yammine as Vice President of Research and Development. (*Id.* at ¶ 27.) Yammine states that he was hired for a project unrelated to CV Timeline. (Doc. 1 at ¶ 13.)

In January 2020, in a discussion with a coworker about intellectual property, Yammine stated that he owned the Domain. (Doc. 35-3 at 2.) Yammine then founded a new company called "CVT spolka z ograniczona odpowiedzialnoscia" and listed the Domain as the company's web address. (*Id.* at ¶ 35–36.) TB4HR did not find out about Yammine's activities until late May 2020. (Doc. 35 at ¶ 39.) In June 2020, TB4HR fired Yammine. (*Id.* at ¶ 43.) TB4HR alleges that Yammine and other employees wrongfully controlled the Domain and were double-dealing. (*Id.* at ¶ 35.) One year later, Yammine went into business with a Swiss technology company to sell the CV Timeline product. (*Id.* at ¶ 47.)

In October 2020, TB4HR commenced a World Intellectual Property Organization ("WIPO") arbitration as an attempt to regain control of the Domain. (*Id.* at ¶ 56.) Late December 2020, a WIPO panelist determined the Domain belonged to TB4HR and ordered that it be transferred to TB4HR. (*Id.*) The UDRP allows a defendant to file an action within 10 business days to prevent the WIPO-ordered transfer. (*Id.*; Doc. 1 at ¶ 27.) Accordingly, Yammine had to commence an action specifically in this district to stop the transfer. (Doc. 1 at ¶ 27.)

Yammine filed the Complaint against TB4HR in January 2021, and seeks, *inter alia*, declaratory relief. (*Id.* at ¶ 1.) TB4HR then filed the First Amended Answer and seven counterclaims. (Doc. 35.) In the pending Motion, Yammine moves to dismiss four of the seven counterclaims against him for lack of personal jurisdiction and, in the alternative, five of the seven counterclaims for failure to state a claim upon which relief can be granted. Yammine does not challenge the exercise of personal jurisdiction over Count I (Cyberpiracy), Count III (Declaratory Relief), and Count V (Conversion) of the counterclaims. (Doc. 44 at 7 n.1.)

## II.   LEGAL STANDARDS

### A.   Rule 12(b)(2)

Under Rule 12(b)(2) of the Federal Rules of Civil Procedure, a defendant may move, "prior to trial, to dismiss the complaint for lack of personal jurisdiction." *Data Disc, Inc. v. Sys. Tech. Assocs., Inc.*, 557 F.2d 1280, 1285 (9th Cir. 1977). The plaintiff bears the burden to show that an exercise of jurisdiction is proper. *Ziegler v. Indian River Cnty.*, 64 F.3d 470, 473 (9th Cir. 1995). Here, the plaintiff "need only make a prima facie showing of jurisdictional facts." *Sher v. Johnson*, 911 F.2d 1357, 1361 (9th Cir. 1990) (internal citation omitted). When examining whether there is a prima facie showing of jurisdictional facts, any "uncontroverted allegations in [the complaint] must be taken as true, and conflicts between the facts contained in the parties' affidavits must be resolved in [plaintiff's] favor." *AT&T Co. v. Compagnie Bruxelles Lambert*, 94 F.3d 586, 588 (9th Cir. 1996) (internal quotation marks and citations omitted).

### B.   Rule 12(b)(6)

To survive a motion to dismiss for failure to state a claim, a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief" such that the defendant is given "fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting Fed. R. Civ. P. 8(a)(2); *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). Dismissal under Rule 12(b)(6) "can be based on the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988). A complaint should not be dismissed "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of the claim that would entitle it to relief." *Williamson v. Gen. Dynamics Corp.*, 208 F.3d 1144, 1149 (9th Cir. 2000).

The Court must accept material allegations in the complaint as true and construe them in the light most favorable to the plaintiff. *North Star Int'l v. Ariz. Corp. Comm'n*, 720 F.2d 578, 580 (9th Cir. 1983). "Indeed, factual challenges to a plaintiff's complaint have no bearing on the legal sufficiency of the allegations under Rule 12(b)(6)." *Lee v. City*

*of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001). Review of a Rule 12(b)(6) motion is "limited to the content of the complaint." *North Star Int'l*, 720 F.2d at 581.

## III.    DISCUSSION

### A.    Personal Jurisdiction

Yammine challenges this Court's exercise of personal jurisdiction over half of the counterclaims against him. He asserts that the four counterclaims at issue are "unrelated" to his act of registering the Domain with GoDaddy, which is headquartered in Arizona, and that act alone is insufficient to support personal jurisdiction. (Doc. 44 at 8–15.) TB4HR argues that Yammine has consented to personal jurisdiction over any potential counterclaims because Yammine invoked this Court's jurisdiction by filing his initial complaint. (Doc. 55 at 12–14.)

"Once a plaintiff invokes the jurisdiction of a federal court by filing a complaint, the court maintains jurisdiction over the plaintiff for all subsequent proceedings, including all counterclaims asserted against the plaintiff." *Verve LLC v. Hypercom Corp.*, No. CV-05-0365-PHX-FJM, 2006 WL 8441358, at *4 (D. Ariz. June 13, 2006); *see also Leman v. Krentler-Arnold Hinge Last Co.*, 284 U.S. 448, 451 (1932) (finding jurisdiction existed because the plaintiff, upon bringing suit in federal district court, "submitted itself to the jurisdiction of the court with respect to all the issues embraced in the suit, including those pertaining to the counterclaim of the defendants"). Stated differently, a plaintiff who avails himself of the district court consents to the district court's personal jurisdiction over the counterclaims against him.

Yammine invoked the jurisdiction of this Court by filing his complaint against TB4HR here in the District of Arizona. *Schnabel v. Lui*, 302 F.3d 1023, 1037 (9th Cir. 2002) ("[P]laintiffs who avail themselves of the district court consent to personal jurisdiction."). Accordingly, the Court maintains jurisdiction over all subsequent proceedings "embraced in the suit"—including all of TB4HR's counterclaims. *Leman*, 248 U.S. at 451. Yammine argues that he filed in this District because it was "the exclusive jurisdiction in which Plaintiff could stop the UDRP decision from taking effect" to contest

personal jurisdiction. (Doc. 44 at 12 (emphasis omitted).) How Yammine came to file in this District does not change the fact that Yammine filed in this District, invoked the jurisdiction of this District, and consented to personal jurisdiction in this District.

Yammine and TB4HR further debate the relatedness of the claims to Yammine's initial complaint. The crux of Yammine's argument is that four of TB4HR's counterclaims against him are "unrelated" to the underlying claim. (*Id.* at 8, 10, 12, 15.) TB4HR argues that all of its counterclaims "relate to the same core controversy over the Domain." (Doc. 55 at 13 n.3.)  Regardless of whether the counterclaims are compulsory or permissive, this Court has jurisdiction. 6 Charles Alan Wright, Arthur Miller and Mary Kay Kane ("Wright & Miller"), Federal Practice and Procedure § 1424 ("In general, if defendant interposes a permissive counterclaim, plaintiff cannot object that the court lacks personal jurisdiction or that venue is improper for purposes of adjudicating the claim."); Wright & Miller, § 1416 ("Plaintiff may not object that the court lacks personal jurisdiction or that venue is improper for purposes of adjudicating a compulsory counterclaim that defendant has interposed. By choosing a particular forum in which to seek affirmative relief, plaintiff effectively waives any objections to that forum based on personal inconvenience."). Because Yammine filed the underlying complaint in this district, he may not contest jurisdiction against any counterclaims filed against him, whether they are permissive or compulsory. Thus, this Court denies Yammine's motion for lack of personal jurisdiction as to Counts II, IV, VI and VII.

### B.    Failure to State a Claim

Yammine alternatively moves to dismiss Counts I, II, IV, VI, and VII of TB4HR's First Amended Counterclaim for failure to state a claim upon which relief can be granted. (Doc. 44 at 7.)[1]

---

[1] TB4HR suggests that Yammine did not fully comply with LRCiv 12.1(c) in filing this motion to dismiss because the motion "omits the certification of the pre-motion meet and confer process." (Doc. 55 at 9, n.10.) But Yammine did not omit the LRCiv. 12.1(c) certification; it was attached to the Memorandum in Support of Plaintiff's Motion to Dismiss. (Doc. 44 at 25.) Thus, Yammine fully complied with the 12.1(c) certification requirements and the Court, in its discretion, will not summarily dismiss Yammine's

1          **1.     Cyberpiracy (Count I) and Trademark Infringement (Count II)**

2          TB4HR brings a counterclaim for cyberpiracy under the Anti-Cybersquatting

3   Consumer Protection Act ("ACPA"). 15 U.S.C. § 1125(d). To state a claim under the

4   ACPA, a plaintiff must allege: "that (1) the defendant registered, trafficked in, or used a

5   domain name; (2) the domain name is identical or confusingly similar to a protected mark

6   owned by the plaintiff; and (3) the defendant acted with bad faith intent to profit from that

7   mark." *DPST Int'l., Inc. v. Nahum*, 624 F.3d 1213, 1218–19 (9th Cir. 2010). Additionally,

8   TB4HR brings a counterclaim for trademark infringement under 15 U.S.C. § 1125(a). In

9   this case, a plaintiff must prove "(1) that it held a valid protectable mark and (2) that the

10  defendant is using a mark confusingly similar." *Cont'l Promotion Grp., Inc. v. Garvin*, No.

11  CV-08-0070-PHX-SRB, 2008 WL 11338887, at *11 (D. Ariz. Mar. 8, 2008) (internal

12  quotations omitted). Yammine contends that Counts I and II must be dismissed because

13  TB4HR "does not allege *any* information that would demonstrate trademark rights in its

14  alleged *unregistered* trademark." (Doc. 44 at 18.) No other elements of the claims are

15  contested, and it is undisputed that the trademark—here, CV Timeline—is unregistered.

16          Protectable ownership interests are established in an unregistered trademark if the

17  mark has been used in commerce. *Adams v. Hartz Mountain Corp.*, No. C14-1174RSL,

18  2014 WL 7151781, at *3 (D. Ariz. Dec. 14, 2014). To show commercial use, a party must

19  prove (1) that it actually adopted and used the mark in commerce before it was registered

20  by another party and (2) the use of the mark was continuous and not interrupted. *Dep't of*

21  *Parks & Recreation for State of Cal. v. Bazaar Del Mundo Inc.*, 448 F.3d 1118, 1125–26

22  (9th Cir. 2006). Protectable ownership interests vest in an unregistered trademark upon a

23  single instance of commercial use, "so long as the use demonstrate[s] both adoption of the

24  mark[] and use in a way sufficiently public to identify or distinguish the marked goods in

25  an appropriate segment of the public mind as [that] of the adopter of the mark." *Adams*,

26  2014 WL 7151781, at *3.

27  _____

28  12(b)(6) Motion.

Here, TB4HR has alleged facts sufficient to raise a plausible inference it has a protectable interest in the unregistered mark because TB4HR used CV Timeline continuously in commerce since the mark's inception. *See id.* (finding the plaintiff alleged facts sufficient to raise a plausible inference of a protectable ownership interest in a mark because the plaintiff used the mark in commerce). TB4HR alleged that the CV Timeline mark was "put into immediate use in commerce broadly and universally across the United States and the world," that it has been used to sell its service on social media since 2018, and $1 million was spent in development and marketing of the mark. (Doc. 35 at ¶¶ 22, 24, 65, 71.) Thus, TB4HR has sufficiently stated a claim to survive a 12(b)(6) motion, and Yammine's Motion to dismiss Counts I and II is denied.

### 2. Misappropriation and Threatened Misappropriation of Trade Secrets (Count IV)

Yammine challenges TB4HR's counterclaim for misappropriation of trade secrets under the Defend Trade Secrets Act ("DTSA") because TB4HR "has not pled what its trade secrets are or their economic value." (Doc. 44 at 13.) 18 U.S.C. §§ 1832, 1836 et seq. To state a claim under the DTSA, a plaintiff must allege: "(1) that the plaintiff possessed a trade secret, (2) that the defendant misappropriated the trade secret; and (3) that the misappropriation caused or threatened damage to the plaintiff." *InteliClear, LLC v. ETC Glob. Holdings, Inc.*, 978 F.3d 653, 657–58 (9th Cir. 2020). Besides the existence of a trade secret, no other elements are contested.

Under the DTSA, a trade secret is defined as "financial, business, scientific, technical, economic, or engineering information" that the owner takes reasonable measures to keep secret and the information derives independent economic value from being a secret. 18 U.S.C. § 1839(3).  The DTSA has an expansive definition of trade secret; a plaintiff meets the *Iqbal* pleading standard even by alleging broad categories of confidential information. *Physics, Material, and Applied Mathematics Rsch. LLC v. Yeak*, No. CV-20-00379-TUC-JCH, 2021 WL 2557398, at *6 (D. Ariz. May 3, 2021) (holding allegations of "trade secrets embodied in written materials, drawings, computer codes, processes,

procedures, equipment, list of suppliers, customers, and contacts regarding specific categories of laser systems" are sufficient to survive a 12(b)(6) motion) (internal quotations omitted); *see also W.L. Gore & Assocs., Inc. v. GI Dynamics, Inc.*, No. CV-10-8088-PHX-GMS, 2010 WL 5184254, at *8 (D. Ariz. Dec. 15, 2010) (holding allegations of "market studies, financial information, manufacturing methods, and . . . future plans, which were not published in the patent applications" are sufficient to survive a 12(b)(6) motion). A plaintiff is not required to plead with such specificity as to reveal the trade secret. *Physics, Material, and Applied Mathematics Rsch.*, 2021 WL 2557398, at *6.

TB4HR alleged its trade secrets "include both knowhow and negative knowhow regarding creating, marketing, selling, designing, updating, and using the software and service comprising CV Timeline" and "[t]he internal workings and design of the CVTimeline Domain and software are also themselves trade secrets." (Doc. 35 at ¶¶ 81–82.) TB4HR also alleges it "conducted research and development into automating the work of recruiters with enhancements in artificial intelligence," and had found "indication[s] that there are patterns that could be followed up on to make enhanced prognostications that accurately identify when a tech professional may be interested in changing their job." (*Id.* at ¶ 15.) These allegations surpass the pleading standard set forth in *Iqbal* and refined in *Physics, Material, and Applied Mathematics Research*, and it is plausible that an entity outside of TB4HR would not have knowledge of TB4HR's software design. Therefore, these allegations are sufficient to state a trade secret.

Yammine also contends that the TB4HR's allegations "make bare bones statements" about how its trade secrets derive economic value. (Doc. 44 at 20.) Trade secrets have independent economic value when their actual or potential value derives from being kept secret. 18 U.S.C. § 1839(3)(B). This value is determined from "the degree to which the secret information confers a competitive advantage on its owner." *Attia v. Google LLC*, 983 F.3d 420, 426 (9th Cir. 2020). As a result, the parties may prove independent economic value via "circumstantial evidence of the resources invested in producing the information, the precautions taken to protects its secrecy, and the willingness

1    of others to pay for its access." *Joshua David Mellberg LLC v. Will*, 96 F.Supp.3d 953,

2    973–74 (D. Ariz. Mar. 30, 2015) (internal quotation marks omitted).

3            Here, TB4HR's allegations of protective measures are sufficient to show that its

4    trade secrets derive economic value. For example, TB4HR pleaded that its trade secrets are

5    "subject to extensive efforts to maintain secrecy and confidentiality" such as requiring

6    employees and contractors to sign confidentiality agreements and restricting access to

7    confidential information to limited subset of people. (Doc. 35 at ¶ 80.)  Moreover, TB4HR

8    employs technical safeguards of data encryption and password protection corresponding to

9    a user's role in the company. (*Id.*) And "everyone who would possible obtain confidential

10   information, third parties, contractors, and/or employees would all have to sign

11   confidentiality agreements first." (*Id.* at 13, n.3.) These assertions, coupled with allegations

12   that TB4HR is in a "niche market," are enough for TB4HR to survive a 12(b)(6) motion to

13   dismiss on this claim. (*Id.* at ¶¶ 11–13.) Yammine's Motion to dismiss Count IV is denied.

14           **3.    Tortious Interference With Prospective Economic Advantage**

15                  **(Count VI)**

16           TB4HR also alleges a counterclaim for tortious interference with prospective

17   economic advantage. (*Id.* at ¶¶ 98–107.)   For this claim, a plaintiff must allege: "(1) the

18   existence of a valid contractual relationship or business expectancy, (2) the interferer's

19   knowledge of the relationship or expectancy, (3) intentional interference inducing or

20   causing a breach or termination of the relationship or expectancy, and (4) resultant damage

21   to the party whose relationship or expectancy has been disrupted." *FLP, LLC v. Wolf*, No.

22   CV17-0214 PHX DGC, 2017 WL 4699490, at *2 (D. Ariz. Oct. 19, 2017). Yammine

23   contends that TB4HR fails to meet the first element. By referring only to its "potential

24   customers" and "people who may want to do business with TB4HR," Yammine argues

25   TB4HR failed to allege the existence of a business expectancy.  (Doc. 44 at 21–22; Doc.

26   35 at ¶¶ 100, 104.)

27           "A claim for tortious interference with a business expectancy is insufficient unless

28   the plaintiff alleges facts showing the expectancy constitutes more than a mere hope."

1  *Crestwood Capital Corp. v. Andes Industries, Inc.*, No. CV-15-00600-PHX-NVW, 2016

2  WL 3457952, at *19 (D. Ariz. June 24, 2016) (internal citation omitted).[2] When the

3  business expectancy applies to a group of people, courts have permitted a "plaintiff to

4  allege an expectancy with a class of individuals," so long as the group is specifically

5  identifiable. *Dube v. Likins*, 216 Ariz. 406, 414, ¶ 20 (Ct. App. 2007). Thus, business

6  expectancy does not have to be measured by particular relations, instead it "can be

7  measured by looking to a background of business experience rather than a particular

8  relationship." *Pettit v. Ariz. Bd. of Regents*, No. CV 05-2922-PHX-ROS, 2006 WL

9  8422926, at *5 (D. Ariz. Aug. 28, 2006) (internal citation and quotation omitted) (finding

10  a business expectancy when plaintiff allege defendant "deprived [Plaintiff] of future patent

11  and licensing income").

12      TB4HR's complaint states that "Yammine knew at all relevant times TB4HR was

13  attempting to negotiate with and obtain customers in the United States, and beyond, for

14  [CV Timeline]." (Doc. 35 at ¶ 99.) As a result, TB4HR alleged Yammine interfered with

15  "potential customers" and "people who may want to do business with TB4HR." (*Id.* at ¶¶

16  100, 104.) Even with TB4HR's reference to a targeted advertising campaign, this is not

17  enough to prove its business expectancy constitutes more than a "mere hope." (*Id.* at ¶ 23.)

18  *Crestwood Capital Corp.,* 2016 WL 3457952, at *19; *see also Dube,* 216 Ariz. at 414

19  ("Although the tort of tortious interference with a business expectancy covers situations

20  that the tort of intentional interference with a contract does not, the former has only been

21  available in those situations where the plaintiff can identify the specific relationship with

22  which the defendant interfered.").

23      TB4HR has not proven a specific relationship with any of its potential customers.

24  TB4HR relies on a string of inapposite cases in unrelated areas or unrelated prongs of the

25  tortious interference test to attempt to prove that potential customers can create a business

26  _____

27  [2] Different standards govern a business expectancy versus contractual relationship. *Rebath LLC v. HD Solutions LLC*, No. CV-19-04873-PHX-JJT, 2020 WL 4514934, at *2 (D. Ariz. Sep. 18, 2020). TB4HR and Yammine only brief the business expectancy standard, and no facts supporting a contractual relationship exist in this record. Accordingly, the Court applies the business expectancy standard.

28

1    expectancy; this is unavailing. (Doc. 55 at 24 n.17.) *E.g., Stoyanof v. Crocodiles Not*
2    *Waterlillies, L.L.C.*, No. CV 11-00384 HWG, 2012 WL 13024085, at \*10 (D. Ariz. Feb.
3    16, 2012) (intentional interference with a business expectancy is not a substitute for
4    defamation); *Sunshine Media Grp., Inc. v. Goldberg*, No. CV-10-0761-PHX-DGC, 2010
5    WL 2899081, at \*6–\*7 (D. Ariz. July 22, 2010) (focusing on whether the interference was
6    improper, not if a business expectancy existed); *Antwerp Diamond Exch. of Am., Inc. v.*
7    *Better Bus. Bureau of Maricopa Cty., Inc.,* 130 Ariz. 523, 530 (1981) (considering whether
8    the defendant had specific intent to interfere with a business relationship, not if the
9    customers constituted a business expectancy); *Mach 1 Air Servs., Inc. v. Garcia*, No. CV-
10   08-0911-PHX-FJM, 2008 WL 3200777, at \*1 (D. Ariz. Aug. 6, 2008) (addressing a claim
11   for tortious interference with existing and prospective contractual relations, not business
12   expectancy). Thus, TB4HR's reference to "potential customers" and "people who may
13   want to do business with TB4HR" is not enough to establish a business expectancy. (Doc.
14   35 at ¶¶ 98–107.) Yammine's Motion to dismiss Count VI is granted.

15                  **4.    Breach of Fiduciary Duties (Count VII)**

16           Yammine asserts TB4HR's counterclaim for breach of fiduciary duties must be
17   dismissed because Yammine resides in Poland, so the application of Arizona law is
18   "complete overreach." (Doc. 44 at 22–23.) TB4HR advocates for the application of
19   Arizona law because Yammine registered the Domain in Arizona "in violation of the
20   loyalties he owed to [TB4HR]." (Doc. 55 at 24–25.) "To properly plead a claim for breach
21   of fiduciary duty a party must show: (1) the existence of a fiduciary duty, (2) its breach,
22   and (3) damages resulting from the breach." Where Yammine resides and where the
23   conduct occurred has no significance in the Court's fiduciary duty analysis. *See Wine Educ.*
24   *Council v. Arizona Rangers*, No. CV-19-02235-PHX-SMB, 2020 WL 7352632, at \*7 (D.
25   Ariz. Dec. 15, 2020) (listing the elements of a breach of fiduciary duty claim, but not listing
26   the situs of the conduct). Yammine cites no law in support of his assertion that a breach of
27   fiduciary duty claim turns on where the conduct occurred. Additionally, as the parties gave
28   no written notice of intent to raise an issue of foreign law, this Court is under no obligation

to apply any other law. *MCA, Inc. v. U.S.*, 685 F.2d 1099, n.12 (9th Cir. 1982). TB4HR and Yammine have not provided such written intent, so this Court looks to Arizona as the forum state to determine what fiduciary duties Yammine owed. *See id.*

Yammine also contends that TB4HR has not alleged any actual harm. But TB4HR alleged it projected to make $5 million in profit "using the Service and Mark, but due to the consumer-confusing activities of Yammine through the Domain and in his dilution of the Mark, they have been unable to profit at all." (Doc. 35 at ¶ 50.) Thus, TB4HR alleged harm sufficient to survive Yammine's motion to dismiss. As such, Yammine's motion to dismiss Count VII is denied.

**IV.  CONCLUSION**

Accordingly,

**IT IS ORDERED denying** Plaintiff/Counter-Defendant Marco Yammine's Motion to Dismiss Counts II, IV, VI, and VII of Defendant/Counter-Plaintiff TB4HR's Counterclaim for lack of personal jurisdiction. (Doc. 43.)

**IT IS FURTHER ORDERED denying** Plaintiff/Counter-Defendant Marco Yammine's Motion to Dismiss Counts I, II, VI, and VII for failure to state a claim. (Doc. 43.)

**IT IS FURTHER ORDERED granting** Plaintiff/Counter-Defendant Marco Yammine's Motion to Dismiss Count VI for failure to state a claim. (Doc. 43.)

**IT IS FURTHER ORDERED** TB4HR shall have until close of business on **March 18th, 2022**, to file an amended Counterclaim in conformance with the requirements set forth in this Order.

**IT IS FINALLY ORDERED denying** Defendant/Counter-Plaintiff TB4HR's request for jurisdictional discovery. (Doc. 55 at 9, n.8.)

Dated this 14th day of March, 2022.

*Michael T. Liburdi*

Michael T. Liburdi
United States District Judge

- 13 -